# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ANTIETAM WIRELESS
SERVICES, LLC, and FAITH
EVANGELICAL LUTHERAN
CHURCH,

        Petitioners,

      v.

NEW CASTLE COUNTY BOARD
OF ADJUSTMENT,

        Respondent.

)
)
)
)
)
)
)
)
) C.A. No. N18A-09-004 CLS
)
)
)
)
)
)
)
)
)

Date Assigned: March 1, 2019
Date Decided: June 27, 2019

*On Appeal from the New Castle County Board of Adjustment.*
**REVERSED.**

Richard A. Forsten, Esquire, Pamela J. Scott, Esquire, Saul Ewing Arnstein & Lehr, LLP, Wilmington, Delaware, Attorneys for Petitioners.

Aysha L. Gregory, Esquire, Daniel P. Murray, Esquire, New Castle County Office of Law, New Castle, Delaware, Attorneys for Respondent.

**SCOTT, J.**

This is an appeal from a decision of the New Castle County Board of Adjustment ("Board") denying a Special Use permit to appellants Antietam Wireless Services ("Antietam") and Faith Evangelical Lutheran Church ("Faith").[1] Faith is the owner of the twelve-acre parcel located at 2265 Red Lion Road, Bear, Delaware (the "Property"). Antietam applied for a Special Use permit to construct a 150-foot cell tower on the Property (the "Application"). For the reasons set forth herein, the decision of the New Castle County Board of Adjustment is **REVERSED**.

## Background

The Board conducted a public hearing on June 28 and August 9, 2018, for the purpose of determining whether Antietam's Special Use Application should be granted. Antietam applied for the permit to construct a cell tower on the Property in order to accommodate an anticipated increase in data traffic. Prior to the hearing, Antietam submitted detailed drawings and a site plan showing, among other things, the location, design and height of the proposed tower, as well as a cover letter detailing how the Application satisfied the pertinent requirements for a special use permit. In addition to Antietam's submissions, the Department of Land Use (the "Department") submitted a written Report of Recommendation to the Board, recommending that the Board grant the requested special use permit because

---

[1] Pursuant to 22 *Del. C.* § 328 grants the Superior Court jurisdiction to hear appeals challenging the illegality of the Board's decision. *See Mitchell v. Bd. of Adjustment,* 706 A.2d 1027, 1028 n.3 (Del. 1998).

2

Antietam met the requirements for a special use permit and adequately addressed the standards for installing a new commercial communications tower.[2]

*The Board's Public Hearings*

At the hearing, Michael Shine, the Principal for Antietam Wireless Services, along with his agents, Richard Forsten, Esq. and Michael Clary, P.E., presented the Application. Antietam began the hearing by providing statistics to illustrate the growth in general demand for cellular data.[3] The goal of the new tower is to provide reliable cell service, assuring fewer dropped calls and more robust support for all cellular services. Antietam provided additional supporting documents, including: aerial photos of the Property, one of which indicated the location of the proposed tower; ground level photos of the area; data coverage maps of the area to demonstrate the increase in reliable coverage the proposed tower would provide; and an article that reviewed and discussed the lack of impact a cell tower has on property values based upon numerous appraisal studies, two of which were in Delaware.

The tower itself is approximately 271 feet from the property line to the north and 120 feet from the railroad tracks. Antietam described the substantial tree coverage surrounding the proposed site and emphasized that individuals in its

---

[2] Ex. C of Pet'rs' Op. Br. at 8. (Decision of the Board of Adjustment) (Sept. 13, 2018) (D.I. 9) [hereinafter, "Board's Decision"].

[3] *Id.* at 3-4 ("Between 2007 and 2014, AT&T saw a 100,000% increase in traffic data on its network. Cisco Systems projects that traffic demand will increase six-fold between 2015 and 2020.").

immediate vicinity will be unable to see the tower. And, Antietam acknowledged that though individuals approximately half a mile or more away may be able to see the tower above the trees, it will be off in the distance. Antietam asserted that cell phone towers blend into the background and do not affect property values in any appreciable way, and presented an article indicating the same as support. Antietam also reviewed facts relevant to the applicable requirements of Sections 40.03.326 and 40.31.430 of the New Castle County Code of Ordinances. Whether the Application satisfied Sections 40.31.430(B)(3) and (4) were determinative in the outcome of the proceeding. Subsection (B)(3) requires that "[t]he use is compatible with the character of the land in the immediate vicinity."[4] Subsection (B)(4) requires "[t]he design minimizes the adverse effects, including visual impact on adjacent lands."[5]

Antietam sought to demonstrate that the use is compatible with the character of the land in the immediate vicinity and minimizes visual impact on adjacent lands through the following means, as outlined by the Board's decision:

> 1. The Subject Property is 12 acres in area, heavily forested, and surrounded by forested properties. The design minimizes adverse effects, including visual impact on adjacent lands, by relying on the thick tree cover at ground level. While acknowledging that the trees on the Subject Property are deciduous, the Applicant argued that even without leaves, due to the substantial breadth of the forest in most

---

[4] New Castle County, Delaware Code of Ordinances § 40.31.430(B)(3).
[5] New Castle County, Delaware Code of Ordinances § 40.31.430(B)(4).

4

directions and the sheer number of trees, the tower would be shielded from view year-round.

2.    The Applicant also supported the tower's alleged consistency with the surrounding land's character by noting that there are other towers located throughout the County located in closer proximity to residential properties and that are more visible from outside their host parcels. Nothing especially distinguishes this locale from many other topographically similar areas where cell towers exist in harmony with the land, the Applicant suggests.

3.    Additionally, the tower will blend in with the vertical presence of many existing utility poles nearby.[6]

The Board then invited public comment. In addition to the witnesses, an excess of fifty persons from the surrounding community attended the hearing. When polled by the Chair, not one person was willing to testify in favor of the Application while thirteen individuals testified in opposition to the Application. From all of the witnesses who commented on the visibility of the proposed tower, the general message was that the tower would be incompatible with the character of the surrounding landscape. Thereafter the Board continued the hearing to another date to allow Antietam's counsel and the Board's attorney to research and address a legal issue raised by a member of the public.[7]

---

[6] *Id*. at 5.

[7] *See id*. at 7-8; *see also* Transcript of the New Castle County Board of Adjustment at 85-87 (Application 2018-0148-A) (June 28, 2018) [hereinafter "Tr. of June Public Hearing"]. When the hearing resumed on August 9, 2018, Antietam provided a written submission concluding that the case is not applicable to the matter before the Board. Antietam explained, and the Board's attorney concurred, that the matter before the Board is distinguishable because Antietam is seeking a special use permit

On rebuttal, Antietam summarized its prior arguments pertaining to the satisfied requirements set forth in Sections 40.03.326 and 40.31.430. Antietam added that if the tower's height were reduced it would decrease in effectiveness, and explained that the at-issue legal standards found in Section 40.31.430 (B)(3) and (4) require the design to minimize the visual impact, as opposed to negating any and all adverse impact. Antietam asserted that the windmill feature does an adequate job of minimizing the visual impact on adjacent lands, and reiterated that the proposed site is far enough away from homes and sufficiently screened by mature trees.[8]

*The Board's Discussion, Vote, and Decision*

After fully hearing Antietam's presentation, the Department's recommendation, and public comments, the Board moved to vote on whether to grant the requested special use permit. The Board chair stated the following, in relevant part:

> My impression in looking over the evidence as illuminated by a site visit is that this is a very good location to put a cell tower. That there is substantial forest around it and it's a nice big site. It's fairly typical of places that cell towers are put. . . . There are a lot of deciduous trees. . . . Overall it seems to me that the community may be making a mistake here. . . . Probably a mistake to oppose this because we think it probably will fit in.
>
> However, there is no greater expert on what is consistent with the character of the local community than the people who live nearby. And

in accordance with the local New Castle County Code provisions. *See* Board's Decision at 8.

[8] *Id.*

6

they are out in force. It's impossible to ignore. No matter what . . . we may personally find to be the lack of impact on the community for this cell tower . . . that's not the question. The ultimate experts on this are the people who live in the area. . . .

[Cell towers] just don't bother people. But it's become an object of community focus here. And with superb organizing and a lot of feeling and a general sense of the community to reject this. And I don't see how the Board can ignore that input the community this particular installation with this height and this particular adornment at the top to be inconsistent with the character of the land in the immediate vicinity. And for that reason I intend to vote against [the Application].[9]

Ultimately, two Board members voted to grant the Application, while three Board members voted to deny it.[10]

In its Decision, the Board determined that the Application met all of the New Castle County Code requirements except for one – Section 40.31.430(B)(3).[11] The Board found that Antietam failed to demonstrate that the cell tower was compatible with the character of the land in the immediate vicinity.

The Board recognized that, as Antietam argued, there is a legitimate point of view that there is in fact no land in New Castle County that would be compatible with a 150-foot tall cell tower as such a tall tower, by its very nature, will protrude

---

[9] Transcript of the New Castle County Board of Adjustment at 85-87 (Application 2018-0148-A) (Aug. 9, 2018) [hereinafter "Tr. of August Public Hearing"].
[10] *Id.* at 8-9.
[11] Board's Decision at 9. The Board opined that it accepts that the requirement of Section 40.31.430 (B)(4) to minimize visual impact, insofar as possible for a 150-foot communications tower, is satisfied.

7

noticeably above nearly any landscape.[12] The Board also acknowledged a potential interpretation of Section 40.03.326(E) which, if intended by County Council, could negate the Board's power to find that this particular use can ever be denied as incompatible with the character of the surrounding land because it is visible from outside the property.[13] In regard to this, the Board noted:

> The requirement that cell towers be "camouflaged" or "disguised" in every case, coupled with the stringent imperative that no approval of a new tower occur absent a showing of both technical and economic unfeasibility to provide alternative design, could indicate a legislative intent to "occupy the field" and thereby except cell towers from disapproval based solely on a finding of incompatibility with the character of the land because of aesthetic opposition.[14]

Still, the Board declined to find as a matter of law that a special use permit for a communication tower is exempt from considerations of visual impact on the

---

[12] *Id*. at 10.

[13] Section 40.03.326(E) provides:

> E. Alternative design tower structure. Where co-location is not possible, an application for new or replacement towers/monopoles shall provide the Department with a report and plans on the feasibility of locating the antenna on a support structure that screens or camouflages the presence of the antennas and support structure from public view, in a manner appropriate to the site's context and surrounding environment. Examples of concealed, camouflaged, or disguised antenna structures include manmade trees, clock towers, flagpoles, light structures, steeples and other similar like objects. The Department or Board of Adjustment shall not approve a new tower/monopole unless it is determined to be both technically and economically unfeasible to provide for some sort of alternative design.

[14] Board's Decision at 10 (emphasis in original).

surrounding community under Section 40.31.430(B)(3), and further noted that "such visual impacts mostly propelled the community objections here."[15] The Board observed:

> The Applicant had the opportunity to alter its Application by proposing a smaller and less obtrusive tower. In this case, the Board sensed that decorating the tower with a fake windmill might have increased its visual disruption of the surrounding land rather than being an effective disguise, and further incensed residents. The Applicant might have reduced impact by lowering the proposed functional height of the tower (which would have traded off a concomitant loss of effective range) but did not. Rather, the applicant chose to proceed with a 150 foot tower "disguised" as a windmill.[16]

To that end, the Board noted:

> The Applicant might have applied for exception from the statutory camouflaging requirements but did not. Such relief would have permitted the shortening the tower by 10 feet and reducing its mass because of decreased wind loading. The Board therefore did not consider such a measure. Although relief from the "camouflaging" requirement for communications towers could be appropriate in some instances, the highly specific language of Section 40.03.326(E) caused us not to take that initiative.[17]

Two Board members viewed the parcel for purposes of familiarizing themselves with the Property.[18] And, "despite their personal impression that a cell tower should be relatively inoffensive in the proposed location, joined the voting

---

[15] Board's Decision at 11.
[16] *Id.*
[17] *Id.* at n.2.
[18] Board's Decision at 12 ("It is permissible for Board members to view the parcel for purposes of familiarizing themselves with the property.) (citing *Cooch's Bridge Civic Ass'n v. Pencader Corp.*, 254 A.2d 608, 609–10 (Del. 1969)).

9

majority Board members who considered the local residents to be experts regarding the character of the land in the immediate vicinity of the proposed use.[19]

The Board explained in its Decision that it gave significant weight to the statements and petitions with hundreds of signatures from local residents declaring that the tower is incompatible with the local environment in deciding to deny the Application.[20] However, while the quantity of opponents was "impressive," the Board found that the number of opponents "mostly served to amplify the more important factors of quality, specificity and evident sincerity of community objections to altering the character of the valley in which this construction was proposed."[21] It was "[t]hose objections," the Board wrote, that "tipped the Board into a debated, narrowly reasoned and split 2-3 vote to deny the special use permit."[22] The Board's Decision concluded with the following:

> In the end, the Board finds that the extraordinary level and quality of community opposition cannot be ignored, absent specific judicial or legislative guidance to the contrary on the narrow issue at hand. If such testimony cannot turn the decision, what purpose does it serve to ask for public comment as to whether use for a communication tower is compatible with the character of the land in the immediate vicinity?[23]

---

[19] Board's Decision at 12.
[20] *Id.* at 11-12 ("Community opposition was remarkably numerous and vigorous, but even more persuasively was the consistent [sic] in the nature and quality of the views expressed. Local residents desire to maintain what they consider to be a rural character in their vicinity, which they believed a cell tower would damage.").
[21] *Id.* at 12.
[22] Board's Decision at 12.
[23] *Id.*

## Parties' Contentions

Antietam seeks for the Court to reverse the Board's denial and order the Application granted.[24] Antietam argues that, in substituting the judgment of opponents for their own judgment, two Board members erred as a matter of law and acted in an arbitrary and capricious manner.[25] Antietam asserts that "by their own admission, two Board members acted in disregard of the facts and circumstances of the case - substituting the opinion of local residents who opposed the tower for their own independent judgment . . . ."[26] In support of this assertion, Antietam directs the Court to the Board Chair's remarks made prior to the Board's vote.[27]

Antietam also argues that the Board's decision should be reversed as it is "replete with other errors and misunderstandings."[28] Namely, Antietam contends that the Board erred in: (i) suggesting that it might have approved the Application if the tower were 10 feet shorter;[29] (ii) viewing the compatibility requirement as an "expert" determination and deferring to the residents as "experts;"[30] and (iii) denying the Application based merely on community opposition.[31]

---

[24] Pet'rs' Op. Br. at 17.
[25] *Id.* at 2.
[26] *Id.* at 12-13 (internal quotation marks omitted).
[27] *See supra* note 9 and accompanying text.
[28] Pet'rs' Op. Br. at 18.
[29] *Id.*
[30] *Id.* at 19-20.
[31] *Id.* at 21-22.

The Board refutes Antietam's contention that members of the Board disregarded the facts of the case in voting against the Application and argues that its decision was a product of reason and logical deduction supported by the substantial evidence in the record.[32] In this regard, the Board contends that it "analyzed all specific and general requirements of a special use permit, and found the Application failed in one aspect: the compatibility with the character of the community."[33] The Board argues that it found Antietam's application deficient concerning the character of the land, including its argument that the site was large enough to shield the tower and that cell towers were now commonplace.[34] The Board asserts that the two Board members in question found the location to be incompatible based on the totality of the evidence, including public testimony.[35] It is because those two Board members used their independent judgment in considering all of the evidence, the Board argues, that they chose to join the voting majority despite their personal impressions from viewing the site.[36]

Moreover, the Board argues that its denial of the Application did not turn on Antietam's failure to reduce the height of the tower, and that any discussion

---

[32] Resp't's Answ. Br. at 15.
[33] *Id.* at 15 (citing Board's Decision at 12).
[34] *Id.* at 16.
[35] Resp't's Answ. Br. at 21-22.
[36] *Id.* at 22 ("As is their duty, they adduced, considered and weight conflicting evidence; they found more weight on one side.").

12

regarding whether the § 40.03.326(E) camouflaging requirement was necessary in this particular circumstance was independent of the discussion on the tower's compatibility.[37] Next, the Board argues that, despite using the word "expert" in describing the neighboring residents who testified as to the proposed towers impact on the character of the area, there is no evidence to support Antietam's assertion that the Board credited the neighboring residents' testimony as "expert testimony" in the legal meaning of the term.[38] Rather, the Board contends, it afforded the neighboring residents' testimony the proper weight, "as their testimony was based on their personal experiences of the area's character."[39] For this reason, the Board avers that it provided more weight to neighboring residents' testimony of the area's character than it did Antietam's argument that the proposed tower would be in a forested location and that such towers were routinely found throughout New Castle County.[40]

Finally, the Board opposes Antietam's claim that it allowed the public to make its decision in denying the Application. The Board contends that it carefully analyzed both the general and specific special use requirements found in §§ 40.03.326 and 40.31.430, conducting a hearing on two dates and developed an expansive record before concluding that the strong public testimony and written

---

[37] *Id.* at 23-24.
[38] *Id.* at 26.
[39] *Id.* at 26.
[40] *Id.* at 26.

13

opposition regarding the nature of the immediate vicinity was more persuasive than Antietam's evidence. The Board argues that it considered the needs of the general community, among other things, the growing demand for cell service, and the social utility of cell towers, and determined that the balance of equities was such that Antietam did not satisfy the compatibility requirement.[41]

## Standard of Review

In reviewing an appeal from the Board of Adjustment, the Court must limit its scope of review to correcting errors of law and determining whether substantial evidence exists in the record to support the Board's findings of fact and conclusions of law.[42] "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[43] When substantial evidence exists to support the Board's decision, the Court may not reweigh the evidence or substitute its own judgment for the Board's.[44] The Board, not the Court, has the power to weigh evidence and to resolve conflicting testimony and issues of credibility.[45]

---

[41] *Id.* at 28.

[42] *Mesa Commc'n Grp. v. Kent Cty. Bd. of Adjustment*, 2000 WL 33110109, at *3 (Del. Super. Ct. Oct. 31, 2000) (citing *Mellow v. Bd. of Adjustment of New Castle Cty.*, 565 A.2d 947, 954 (Del. Super. Ct. 1988)); *see* 29 *Del. C.* § 10142(d).

[43] *Wadkins v. Kent Cty. Bd. of Adjustment*, 1999 WL 167776, at *2 (Del. Super. Ct. Feb. 23, 1999).

[44] *Janaman v. New Castle Cty. Bd. of Adjustment*, 364 A.2d 1241, 1242 (Del. Super. Ct. 1976).

[45] *Mellow*, 565 A.2d at 954.

The party seeking to overturn the Board's decision has the burden of persuasion to show that the decision was arbitrary and unreasonable.[46] "If the Board's decision is fairly debatable, there is no abuse of discretion."[47] Despite the Board's wide discretion, it may not do whatever it considers equitable without regard to statutory requirements and the need for substantial evidence to satisfy those requirements.[48] The Board must particularize its findings of fact and conclusions of law to enable the Court to perform its function of appellate review.[49]

## Discussion

At the heart of Antietam's argument for reversal of the Board's decision is that the Board failed to act independently and impartially in replacing their own judgment with the opinion of local residents opposing the tower.[50] Antietam argues that "the Board must balance the needs and welfare of the general community against the feelings of local neighbors." For support, Antietam asserts that in *Beatty v. New Castle County Board of Adjustment*,[51] this Court, "made clear that the neighborhood concerns are not enough to deny a permit."[52]

---

[46] *Mesa Commc'n Grp.*, 2000 WL 33110109, at *3.
[47] *Mellow*, 565 A.2d at 956.
[48] *Janaman*, 364 A.2d at 1242-43.
[49] *Profita v. New Castle Cty. Bd. of Adjustment*, 1992 WL 390625, at *2 (Del. Super. Ct. Dec. 11, 1992).
[50] Pet'rs' Op. Br. at 3.
[51] *Beatty v. New Castle Cty. Bd. of Adjustment*, 2000 WL 972660 (Del. Super. Ct. May 23, 2000).
[52] Pet'rs' Op. Br. at 15.

15

In *Beatty*, the appellant appealed the Board's decision to grant Delmarva Power & Light Company a special use permit for the purpose of installing a 200-foot communication tower.[53] The appellant raised concerns regarding, among other things, the detrimental effect on the property values of the adjacent landowners.[54] In affirming the Board's decision, the court found that there was "substantial evidence to support no detriment or injury to the community."[55]

First, the *Beatty* court found substantial evidence that there was a necessity for the tower to ensure complete wireless communications, and to effectuate the removal of another tower while simultaneously temporarily negating the need for additional towers in the community.[56] Moreover, the court in *Beatty* observed that "[s]itting on a 7.8 [acre] of land, the tower would be set back considerably, limiting its visibility from the road and adjacent communities."[57] The court also noted that a 160-foot communication tower already existed at the site for some time and,

---

[53] *Beatty*, 2000 WL 972660 at *5.
[54] *Id*. at *2.
[55] Though the *Beatty* Court applied the New Castle County Code - rather than the Unified Development Code as in this appeal - it noted "[w]hile the terms 'detrimental' and 'injurious' are not specifically defined by the [New Castle County Code] Code, its common usage would logically mean that the new use of the property should neither substantially impair the *integrity* and *character of the zoning designation* nor be harmful to the public's health or the welfare of the community." *Beatty*, 2000 WL 972660, at *5; *see id*. at *2 n.9 ("Since the application was received in November, 1997, the Board used the standards of the New Castle County Code.").
[56] *Id*. at *4.
[57] *Id*.

16

although adding 40 feet would undoubtedly make the tower more noticeable, "this is not a situation where the County is attempting to dramatically alter what is already on the property."[58] As a result, the *Beatty* court found that there was substantial evidence that no detriment or injury to the community would arise from the tower and opined the following:

> When one clears the smoke over the controversy, this case is what the Court would characterize as a "not in my backyard" concern. The Court appreciates and understands this concern and is confident that the Appellant's and his neighbors' feelings on the issue were sincere and heartfelt. But, *if the statutory requirements of detrimental or injurious meant simply that a neighbor does not like a change in the contour of his neighborhood, the standard seldom, if ever, could be met.*
>
> The Court understands that a decision of this nature by the Board is normally never a popular one, and whenever an application of this nature is filed, the adjacent landowners have a legitimate concern about its effect on the values of their homes and the quality of their community. But *these concerns must be appropriately balanced with the needs and welfare of the general community.* Under the unique facts of this case, the Court finds that there was substantial evidence to support the Board's conclusions.[59]

The Board argues that *Beatty* is critically distinct from the case *sub judice* in that the public comments regarding the tower's impact on the surrounding community were given less weight because there was an existing tower at the time of the application.[60] Conversely, the Board contends, the proposed tower in this

---

[58] *Beatty*, 2000 WL 972660, at *4.

[59] *Id.* at *5 (emphasis added).

[60] Resp't's Answ. Br. at 20.

17

matter is a significant change to the character of the area, where it would stand more than 100 feet over the trees and utility poles in the vicinity.[61]

The Board cites to *AT&T Wireless PCS, Inc. v. City Council of City of Virginia Beach*,[62] to support its argument that large number of area residents testifying in opposition to a permit application and petitions with hundreds of signatures attesting to the negative visual impact on the surrounding area amounts to substantial evidence to sustain a denial.[63] Yet, as Antietam correctly points out,[64] the Virginia Beach City Council is a state legislative body, not a federal administrative agency.[65] In fact, as stated by the court in *AT&T Wireless PCS*, "one should keep the distinction in mind when attempting to impose the 'substantial evidence' standard onto the world of legislative decisions."[66]

Antietam cites to *AT&T v. Sussex County Board of Adjustment*[67] and requests that the Court similarly "exercise its statutory power and reverse the denial and order the Application granted in accordance with the express statements of a majority of

---

[61] *Id.*
[62] 155 F.3d 423 (4th Cir. 1998).
[63] Resp't's Answ. Br. at 18.
[64] Pet'rs' Reply Br. at 6.
[65] *AT&T Wireless PCS, Inc.*, 155 F.3d at 430.
[66] *Id.* ("It is not only proper but even expected that a legislature and its members will consider the views of their constituents to be particularly compelling forms of evidence, in zoning as in all other legislative matters.").
[67] *AT&T v. Sussex Cty. Bd. of Adjustment*, 2015 WL 1975629, at *2 (Del. Super. Ct. Apr. 30, 2015).

the Board."[68] Though Antietam cites *AT&T* for support of its requested relief, the Court finds that case particularly applicable to the facts at issue in the present appeal.[69]

In that case, the appellant appealed the Sussex County Board of Adjustment's ("Sussex Board") decision denying the appellant's application for a special use exemption to construct a 100-foot telecommunications tower.[70] Under the applicable Sussex County Code, once an applicant satisfies the other relevant requirements, the special use exemption is to be granted unless the Sussex Board finds that the exemption "will substantially affect adversely the uses of adjacent and neighboring property."[71] Among other things, the appellant asserted that the Sussex Board's decision was not supported by substantial evidence for its finding that the proposed tower would substantially affect the neighboring properties.[72]

---

[68] Pet'rs' Op. Br. at 17; *see* 9 *Del. C.* § 6918 ("The Court may reverse or affirm, wholly or partly, or may modify the decision brought up for review.").

[69] In *AT&T*, the appellant appealed the Sussex Board's decision denying the appellant's *third* application for a special use exemption. The first time, the application was approved but later reversed on procedural grounds. The second time, the Sussex Board's denial was reversed because it applied the wrong standard. Each time, the appellant had to file a new application because the statute provides no authority to remand. For that reason, the *AT&T* court found that the appellant's case was an appropriate instance for the Court to exercise its power under 9 *Del. C.* § 6918(f) to modify the Sussex Board's decision.

[70] *AT&T v. Sussex County Board of Adjustment*, 2015 WL 1975629, at *2.

[71] *Id.* at *10.

[72] *Id.* at *3.

19

The appellant in *AT&T* argued that "if mere resident disapproval were sufficient to defeat a telecommunications tower proposal, then this would rule out a telecommunications tower near almost any residential area" and denied that "any aesthetic effects of the tower substantially affect[ed] use or enjoyment and argue[d] that the tower is in keeping with the general character of the neighborhood."[73] The appellant also pointed out that while the Sussex County zoning code mentions aesthetics when considering whether or not to grant variances, the code does not mention aesthetics when it comes to cell towers and special use permits.[74] Of particular relevance here is the appellant's argument that "this omission is noteworthy, especially since other jurisdictions like New Castle County do address aesthetics in the cell tower permitting process by requiring towers to have some sort of camouflage."[75] In discussing the admissibility of aesthetic concerns in zoning decisions, AT&T court provided the following analysis:

> While the law in Delaware is unclear, other jurisdictions have found that aesthetic concerns may not be considered in zoning decisions. In *Omnipoint* [*Corporation v. Zoning Hearing Board of Pine Grove Township*], the court held that, under Pennsylvania law, neither aesthetic nor economic concerns are sufficient grounds for denying an application for a special exemption, but this does not mean they cannot be considerations. However, "generalized concerns and conclusive statements within the record about the aesthetic and visual impacts on the neighborhood do not amount to substantial evidence" to justify denying a special exemption. In *Cellular Telephone Co. v. Oyster Bay*,

---

[73] *Id.* at *8.
[74] *Id.*
[75] *Id.*

the Court of Appeals recognized that under New York law, aesthetic concerns may be a sufficient basis for a zoning decision, but the court did not find the aesthetic concerns compelling enough in that particular case because the concerns expressed were few, vague, and sometimes founded on misinformation about what the finished project would look like.[76]

After combining the general nature of the aesthetic complaints from with the lack of any concrete evidence of impact on use other than aesthetics, the court in *AT&T* ultimately found that the record lacked substantial evidence to support the Sussex County Board of Adjustment's denial of the application.[77]

In the instant appeal, the Board in its Decision pondered whether:

> [t]he requirement that cell towers be "camouflaged" or "disguised" in every case, coupled with the stringent imperative that no approval of a new tower occur absent a showing of both technical and economic unfeasibility to provide alternative design, could indicate a legislative intent to "occupy the field" and thereby except cell towers from disapproval based solely on a finding of incompatibility with the character of the land because of aesthetic opposition.[78]

As discussed, the Board ultimately declined to find as a matter of law that a special use permit for a communications tower is exempt from considerations of visual impact on the surrounding community when considering the evidence as to whether "[t]he use is compatible with the character of the land in the immediate

---

[76] *Id*. at *14 (citing *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 20 F. Supp. 2d 875, 880 (E.D. Pa. 1998); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 495 (2d Cir. 1999)).
[77] *Id*. at *14
[78] Board's Decision at 10-11 (emphasis in original).

vicinity."[79] In reaching this conclusion, the Board noted that "County Council might adopt more specific language, or the Courts could assist to interpret currently understood requirements for special use permits in this context."[80]

Federal Courts have widely recognized that "land-use regulation generally affects a broad spectrum of persons and social interests, and . . . local political bodies are better able than Federal Courts to assess the benefits and burdens of such legislation."[81] Nevertheless, the Court finds that there is no substantial evidence in the record upon which the Board could properly deny the Application. The Board's Decision does not cite any specific facts as supporting its conclusion that the proposed tower would be incompatible with the character of the land in the immediate vicinity other than the "quality, specificity and evident sincerity of community objections," concerning the "limits of tolerable aesthetic changes to their living environment."[82] Looking to the transcripts of the public hearings, the Court likewise finds no evidence indicating the tower would not be compatible with the character of the land. Of the local residents who testified at the hearing, their testimony opposing the tower predominantly included concerns of: (i) the visibility of the tower due to the sparse forest around the proposed site or the tower's height;

---

[79] *Id.* at 11; New Castle County, Delaware Code of Ordinances § 40.31.430(B)(3).
[80] Board's Decision at 11.
[81] *Acierno v. Mitchell*, 6 F.3d 970, 975 (3d Cir. 1993) (citing *Taylor Inv., Ltd. v. Upper Darby Twp.*, 983 F.2d 1285, 1291 (3d Cir. 1993)).
[82] Board's Decision at 12.

(ii) increased flood risk; (iii) potential harmful impact on property values; and (iv) health and environmental effects of radio frequency emissions.[83] Yet, the Board's Decision states that it "gave no weight to testimony regarding drainage issues, property values, or health and environmental effects of radio frequency emissions."[84]

The most compelling arguments against the tower concerned its incompatibility with the aesthetic of the area, including the testimony of one local resident regarding several historical buildings in close proximity to the proposed site.[85] Even so, as with the opponents in *AT&T*, the aesthetic concerns expressed by the local residents in the record are vague and nonspecific.[86] The tower is described as a "nuisance" that will "pollute the visual integrity of [the] community."[87] In view of the general nature of the aesthetic complaints from local residents together with the lack of any concrete evidence of incompatibility other than aesthetics, the Court finds that the record lacked substantial evidence to support the Board's Decision denying Antietam's application for a special use permit.

---

[83] *See* Tr. of June Public Hearing at 29-85.
[84] Board's Decision at 11.
[85] *See* Tr. of June Public Hearing at 58-59, 80.
[86] *See AT&T v. Sussex Cty. Bd. of Adjustment*, 2015 WL 1975629, at *14 (Del. Super. Ct. Apr. 30, 2015).
[87] *Id.* at 32, 85.

## Conclusion

For the forgoing reasons, the New Castle County Board of Adjustment's decision is **REVERSED**.

**IT IS SO ORDERED.**

_____

**Judge Calvin L. Scott, Jr.**